**In re Kay HARRISON, Debtor.**

**EDM Machine Sales, Inc., et al., Plaintiffs,**

**v.**

**Kay Harrison, et al., Defendants.**

**No. 02–3492.**

United States Bankruptcy Court, N.D. Ohio.

Aug. 21, 2003.

*The Attorney Handbook for Chapter 13 Practi-* *tioners* (2d ed.1999), p. 21.

Theodore J Lesiak, EDM Machine Sales, Inc., Ronald E. Stokey, Medina, OH, for Plaintiffs.

Kay L. Harrison, Huron, OH, for Defendant.

William H Smith, Jr, Kay L. Harrison, Birmingham Products, Inc., Sandusky, OH, for Defendants.

### DECISION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiffs' Complaint to Determine Dischargeability. At issue at this Trial was the dischargeability of two related debts: (1) Fifteen Thousand dollars ($15,000.00) in personal loans; and (2) Seventy-three Thousand Four Hundred dollars ($73,400.00) in corporate debt. The statutory basis upon which the Plaintiffs' cause of action relies is 11 U.S.C. § 523(a)(2)(A) which generally excludes from the scope of a bankruptcy discharge those debts incurred by fraud. The background facts giving rise to the Plaintiff's cause of action under this section are not in dispute.

The Plaintiff, EDM Machine Sales, Inc. (hereinafter "EDM"), is in the business of buying and selling used machines that are utilized in production work, the other Plaintiff in this action, Ronald Stokey (hereinafter "Mr. Stokey"), is the President of EDM.

During its existence, the Defendant, Birmingham Metal Products, Inc. (hereinafter "BMP"), was a closely-held corporation which specialized in bushing and bearing work; Kay Harrison, the co-defendant in the instant action (hereinafter "Mr. Harrison"), was the majority shareholder and president of BMP. While in operation, BMP bought various machinery from EDM.

In the latter part of the year 2001, BMP ceased production work as the result of accruing debt and declining sales. At the time it ceased operating as a business, BMP owed EDM a total of Seventy-three Thousand Four Hundred dollars ($73,-400.00); included in this figure was a charge of Fifty-four Thousand Four Hundred dollars ($54,400.00) for a "version 400" machine, as well as other miscellaneous charges for things such as repair and delivery. (Plaintiff's Ex. # 1). In addition, Mr. Stokey, in his personal capacity, was owed a total of Fifteen Thousand dollars ($15,000.00) as the result of two loans made in 1998 to Mr. Harrison in his personal capacity.

On September 25, 2002, Mr. Harrison filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. In his petition, Mr. Harrison listed a total of Four Hundred Seventy-six Thousand Six Hundred Twenty and 59/100 dollars ($476,620.59) in unsecured, nonpriority debt, most of which was related to his operation of BMP. On December 23, 2002, EDM, together with Mr. Stokey, filed the instant Complaint against Mr. Harrison and BMP seeking to except from discharge the above listed debts.

## LAW

█ The Plaintiff's Complaint to determine dischargeability is brought pursuant to § 523(a)(2)(A) of the Bankruptcy Code. An action brought under this section is deemed a "core proceedings" over which this Court has the jurisdictional authority to enter final orders. 28 U.S.C. § 157(b)(2)(I). The statutory language of § 523(a)(2)(A) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

It is well-settled that a cause of action brought under this statutory exception to discharge requires that the movant establish, by at least a preponderance of the evidence, the existence of the following elements which are derived directly from the common law elements for fraud: (1) the debtor made false representations; (2) the debtor knew such representations to be false at the time they were made; (3) the representations were made with the intent to deceive the creditor; (4) the creditor relied on the representations; and (5) the creditor's loss was the proximate result of the misrepresentation having been made. *Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 932 (6th Cir.1986); *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr.N.D.Ohio 2001).

## FACTUAL FINDINGS

As it concerns the above elements, and is typical in many cases brought under § 523(a)(2)(A), the focus of the Parties in the present case was on two issues: (1) whether Mr. Harrison, having present knowledge as to the falsity of the representations, acted with the intent to deceive; and (2) whether their was reliance upon those representations. As it relates to the applicability of these issues, the Court, from the evidence presented at the Trial, as well as from all of the evidence presented in this case, makes the following findings of fact in accordance with Bankruptcy Rule 7052:

In 1998, EDM sold, and BMP purchased and paid for a "version 250" machine. At approximately this same time, Mr. Stokey, in his personal capacity, made two loans to Mr. Harrison, also in his personal capacity, totaling $15,000.00. Although no written documentation was produced with respect to the latter transaction, the tacit agreement between the Parties was that the personal loan would be satisfied by the year's end.

In March of 2000, EDM sold to BMP a "version 300" machine. Later this machine was returned to EDM. As a result of the return of the machine, BMP was not charged for the purchase price, but was instead assessed a usage fee of $5,000.00.

In May of 2000, a fire occurred at BMP's place of business. Damaged in the fire was a "version 400" EDM ma-

chine which had been previously purchased by BMP. After the fire, Mr. Harrison induced EDM to sell to BMP a replacement "version 400" machine, agreeing to pay EDM through the insurance proceeds that were to be received from the fire. No written contract, however, of this agreement was ever produced; nor did EDM take a security interest in the "version 400" machine. To expedite the insurance claims process, Mr. Stokey provided to Mr. Harrison information required by the insurance company. On October 11, 2000, an insurance check in the amount of $66,385.00 was issued to BMP. (Plaintiff's Ex. # 2). None of these proceeds, however, were thereafter remunerated to EDM; instead, the proceeds were used by BMP to pay for daily operational costs—e.g., materials and payroll.

With the exception of the personal loans made to Mr. Harrison, Mr. Stokey stated that he looked to BMP, and not Mr. Harrison as the source to satisfy all the outstanding obligations owed to EDM.

In undertaking the above transactions, Mr. Stokey, although he frequently visited BMP's place of business, never conducted any investigation concerning the ability of either BMP or Mr. Harrison to repay their debts, instead relying solely on Mr. Harrison's word.

In June of 2000, Mr. Harrison sustained injuries as the result of a horse riding accident. Due to his injuries, Mr. Harrison was hospitalized for a period of about one month and was unable to fully perform his duties with respect to BMP for a period of approximately six months.

Mr. Harrison has been the president, majority shareholder and day-to-day manager of BMP for approximately 20 years. During most of this time, BMP ran as a profitable company, having at its height approximately 55 employees. However, in the spring of 2000, BMP's business began to experience financial difficulties. (Plaintiff's Ex. # 3). Mr. Harrison attributed BMP's financial difficulties to three sources: (1) beginning in 2000, a significant decline in orders from a major customer, who eventually ceased doing business with BMP in January of 2001; (2) his horse riding accident which, for an extended period of time, interfered with his duties at BMP; and (3) the downturn experienced in the economy which was further exacerbated by the events of the eleventh of September.

With respect to the business difficulties faced by BMP, the evidence in this case revealed that BMP needed approximately $125,000.00 in income every month to maintain its operations. However, from February of 2001 to August of 2001, BMP rarely received half of this amount. (Plaintiff's Ex. # 3).

In November of 2001, BMP ceased operating as a business. Not long thereafter, most, if not all of the assets of BMP, including the "version 400" machine, were foreclosed upon by the major secured creditor of BMP. Up until the time BMP ceased operations, Mr. Harrison continued to receive his fully salary which on an annual basis was well over $100,000.00.

## LEGAL DISCUSSION

Section 523(a)(2)(A) implements the fundamental bankruptcy policy that only those debts which are honestly incurred may be discharged. *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 162 (Bankr. N.D.Ohio 2003). As it pertains to the applicability of § 523(a)(2)(A), the Plaintiffs' position centers primarily on Mr. Harrison's broken promise to pay for the "version 400" machine through the insurance

proceeds that would be paid as a result of the fire that had destroyed the original machine. (Doc. No. 21). In making this statement, the Plaintiffs also pointed out that despite not paying its debt to EDM, Mr. Harrison continued to receive a rather substantial salary from BMP.

With respect to the points raised by the Plaintiffs, it is clearly not favorable to Mr. Harrison's position that after receiving the insurance proceeds, he continued, without any interruption, to draw his full salary from BMP while at the same time causing BMP, as its principal officer, to fail to satisfy its obligation to EDM. Casting this omission in an even further bad light is the fact that not even so much as a partial payment was made to either of the Plaintiffs. Nevertheless, a broken promise to repay a debt, without more, will not sustain a cause of action under § 523(a)(2)(A). *See Jacobs v. Ballard (In re Ballard)*, 26 B.R. 981, 985 (Bankr. D.Conn.1983) (broken promise alone is not a false representation under section 523(a)(2)(A)). Instead, central to the concept of fraud is the existence of scienter which, for purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation. *AT & T Universal Card Services v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir.2001); *Binger v. Bloomfield*, 293 B.R. 148, 153 (Bankr.N.D.Ohio 2003). This tenet is set forth in the second and third elements of the above § 523(a)(2)(A) test which asks whether the debtor, having present knowledge as to the falsity of the representations, acted with the present intent to deceive the creditor.

As it pertains to intent, the Sixth Circuit Court of Appeals set forth that as opposed to employing an objective, reasonable person standard, "the proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt." *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998). A subjective approach, of course, requires that the trier-of-fact focus solely on the individual characteristics of the debtor. Yet, like an objective approach, a subjective approach still entails the utilization of circumstantial evidence given that a debtor will rarely, if ever, admit to acting in a fraudulent manner; helpful in this regard are many of the traditional indicia of fraud—e.g., a suspicious timing of events, insolvency, transfers to family members or other insiders. *In re Bloomfield*, 293 B.R. at 154. In utilizing such indicia, however, the Sixth Circuit cautioned against "factor-counting," instead holding, "[w]hat courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *In re Rembert*, at 282, *citing Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 332 (Bankr.N.D.Ill.1995).

In applying a subjective standard for fraud in this case, a few important considerations mitigate strongly against the existence of any fraudulent intent. Of primary importance, the funds received from the insurance company were not primarily used for Mr. Harrison's direct personal benefit, but were instead utilized to satisfy the pressing obligations of BMP— i.e., mainly debts to critical vendors and payroll for employees. Admittedly, part of BMP's payroll involved fully paying Mr. Harrison's rather significant salary. However, BMP also used the insurance proceeds to pay the salary of all of BMP's employees. Although paying such creditors was obviously done to the detriment of the Plaintiffs, preferring one creditor over another does not equate with fraud. *In re DeReus*, 53 B.R. 362, 364 (Bankr.

S.D.Cal.1985). Important in this regard is that in his personal bankruptcy petition, Mr. Harrison listed numerous creditors constituting just under a half million dollars in unsecured debt, most of which were attributable to the operation of BMP; thus, it is clear that the Plaintiffs were not singled out by Mr. Harrison for unequal treatment. Rather, in preferring certain creditors over others, Mr. Harrison, at the time he received the insurance proceeds, appears to have been simply handling financial crises as they appeared.

Also further mitigating against the existence of fraudulent intent, and closely related to the above discussion, is the Court's inability to discern any significant incentive on the part of Mr. Harrison to defraud Mr. Stokey over the use of the insurance proceeds. For example, the amount of the insurance proceeds was not especially significant as compared to the overall operating costs of BMP—specifically, the insurance proceeds constituted just two weeks of operating costs for BMP, meaning that these proceeds were not crucial for the survival of BMP. Additionally, at the time his promise was made regarding the insurance occurred,—i.e., well over six months prior to the time BMP ceased operations—Mr. Harrison likely saw hope for BMP's continued existence, thereby reducing any incentive to defraud as he would have likely both contemplated and needed a continuing business relationship with Mr. Stokey and EDM.

Finally, in analyzing the existence of fraudulent intent, it must be considered that, although BMP was already experiencing financial problems, Mr. Harrison's promise to Mr. Stokey regarding the insurance proceeds occurred prior to the occurrence of two important events: (1) Mr. Harrison's horse riding accident; and (2) the events of the eleventh of September. Although the exact extent to which these events had on BMP's business is not entirely clear, it would stand to reason that such events could have easily exacerbated an already delicate situation. For example, being the majority shareholder and president of the company, Mr. Harrison's direct and continuous involvement in the day-to-day operations of BMP was likely needed, yet unavailable at a crucial time as the result of the injuries he sustained in the horse riding accident. It is also noteworthy that the insurance proceeds were not received until after Mr. Harrison's accident; thus, at the time he made his promise regarding the insurance proceeds, Mr. Harrison could not have possibly foreseen the effect his accident would have had on BMP's ability to repay its debts. Finally, as it concerns the events of the eleventh of September, it is common knowledge that many companies experienced downturns in their business after this date.

In sum, after considering at the above mitigating factors in the aggregate, the Court is simply not convinced that at the time he made his promise regarding the insurance proceeds, Mr. Harrison had the present intent to deceive Mr. Stokey. In coming to this decision, the Court finds that Mr. Harrison's later action of failing to turnover the insurance proceeds to Mr. Stokey, as opposed to being fraudulent, was simply done in an honest, albeit unsuccessful effort to save his company from financial ruin. In this regard, Mr. Harrison's decision to pay the salary of employees and critical vendors seems typical of many companies, such as BMP, who are facing serious financial problems.

In addition, even if this Court were to discount the above analysis, a serious question exists as to whether Mr. Harrison is, in his personal capacity, even liable for those debts which were to be paid from the insurance proceeds. This is because these

debts did not arise from a direct transaction with Mr. Harrison, but rather involved transactions made directly between BMP and EDM as corporate entities. It is a fundamental rule of Ohio corporate law, however, that "normally, shareholders, officers, and directors are not liable for the debts of the corporation." *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.,* 67 Ohio St.3d 274, 287, 617 N.E.2d 1075 (1993). Although under certain limited circumstances a person may, in the interest of equity, "pierce the corporate veil," the existence of any equitable considerations in this case is highly questionable considering that Mr. Stokey specifically stated that he looked directly to BMP, and not Mr. Harrison in his personal capacity, to pay those debts owed by the corporation. As it concerns those debts owed by BMP, however, one matter should be clarified: as BMP did not file for bankruptcy relief, those debts of the corporation are not subject to discharge. Furthermore, even if BMP had filed for bankruptcy relief, it, as a corporate entity, is not entitled to a bankruptcy discharge pursuant to 11 U.S.C. § 727(a)(1) which limits discharges in Chapter 7 cases to solely "individuals."

■ Notwithstanding, the above analysis only addressed those debts that existed directly between BMP and EDM, and not those personal loans made by Mr. Stokey to Mr. Harrison. In this regard, the above mitigating considerations do not adequately explain Mr. Harrison's complete lack of any remuneration on the personal debt. Of particular importance, unlike the corporate debts, the personal debt became due at the end of the year 1998, which was at least one year prior to the time (even by Mr. Harrison's own accounts), that both he and BMP started to experience financial difficulties. Nevertheless, and as will now be explained, even if for argumentative

sake there existed some level of malfeasance with respect to the personal debts, the Court is not convinced that Mr. Stokey's reliance on Mr. Harrison's representations were justifiable as is required pursuant to the Supreme Court's decision in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

■ The fourth element of the § 523(a)(2)(A) fraud test requires that a creditor establish that he or she relied on the representations made by the debtor. In *Field v. Mans,* the Supreme Court of the United States held that, as opposed to the higher standard of "reasonable," reliance under § 523(a)(2)(A) must be "justifiable." The difference between the two standards is this: "justifiable" is subjective, whereby the creditor's particular circumstances are examined, while "reasonable" employs an objective community standard of conduct. *Chevy Chase Bank, FSB v. Briese (In re Briese),* 196 B.R. 440, 453 (Bankr.W.D.Wis.1996).

Given the subjectiveness of the justifiable reliance standard, its applicability, even under a set of identical circumstances, will vary from creditor to creditor. In *Field v. Mans,* the Supreme Court gave this example:

Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses. A missing eye in a sound horse

is one thing; long teeth in a young one, perhaps, another.

*Id.* at 71, 116 S.Ct. at 444. In this respect, important considerations in looking to a debtor's individual circumstances, may include the size of the loan, the sophistication level of the creditor, and whether a business or consumer debt is involved.

As applied to this case, the facts show that while Mr. Stokey did visit BMP on different occasions, he simply took Mr. Stokey at his word; no credit check was conducted, no reference calls were made; neither, at least to this Court's knowledge, were any formal loan documents executed. Under such circumstances, and after considering that the loans where for all practical purposes a commercial transaction between two relatively sophisticated businessmen, the Court simply cannot see how Mr. Stokey's reliance can be considered "justifiable." In this regard, the Supreme Court cautioned that under the "justifiable reliance" standard of § 523(a)(2)(A), a debtor "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* Therefore, regardless as to whether Mr. Harrison acted with any wrongful motive with respect to the personal loans, such loans are dischargeable as the evidence in this case does not support a finding that Mr. Stokey's reliance was "justifiable."

In summary, the Court cannot find that Mr. Harrison acted with any wrongful intent as it concerns those debts owed by BMP. In addition, with respect to the personal loans, the Court is not convinced that Mr. Stokey justifiably relied on those representations made by Mr. Harrison. Therefore, even if Mr. Harrison acted in a wrongful manner with respect to the personal loans, it is not subject to the exception to discharge set forth in § 523(a)(2)(A). As it pertains to these findings, however, the Court's decision in this matter is confined solely to any personal liability that Mr. Harrison (and not BMP) has with either EDM or Mr. Stokey.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

**ORDERED** that any personal liability that the Debtor/Defendant, Kay L. Harrison, has to either of the Plaintiffs, EDM Machine Sales, Inc. or Ronald E. Stokey, be, and is hereby, determined to be a DISCHARGEABLE DEBT.

It is **FURTHER ORDERED** that the Complaint of the Plaintiffs, be, and is hereby, DISMISSED.